[No. S025579. Dec. 21, 1992.]

HARTFORD FIRE INSURANCE COMPANY, Plaintiff and Respondent,
v.
IRENE MACRI, Defendant and Appellant.

COUNSEL

John A. Luetto and Helen M. Luetto for Defendant and Appellant.

James T. Linford and Joseph Dunn as Amici Curiae on behalf of Defendant and Appellant.

Hawkins, Schnabel & Lindahl, Vipal J. Patel, Kelley K. Beck and Rena Denton Stone for Plaintiff and Respondent.

Murchison & Cumming, Jean M. Lawler, Bryan M. Weiss, Horvitz & Levy, George P. Schiavelli and Douglas G. Benedon as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

LUCAS, C. J.—We granted review to determine whether Insurance Code section 11580.2, subdivision (c)(3) (hereafter § 11580.2(c)(3); all statutory references are to this code unless otherwise stated), requiring an insured to

obtain the written consent of the insurer before the insured makes "any settlement with or prosecute[s] to judgment any action against" an *uninsured* motorist, also applies when an insured seeks *underinsured* motorist benefits under the same policy.

Although underinsured motorist benefits, like uninsured motorist benefits, are governed by section 11580.2, the statutory guidelines insureds must follow to receive underinsured benefits are set forth in section 11580.2, subdivision (p) (hereafter § 11580.2(p)) et seq., which does not contain the "consent to settle" provision found under section 11580.2(c)(3). Moreover, subdivision (p) specifically states that "If the provisions of this subdivision conflict with subdivisions (a) through (o), the provisions of this subdivision shall prevail." Because we find that the "consent to settle" provision of section 11580.2(c)(3) conflicts with the intent and purpose of underinsured motorist coverage as reflected in section 11580.2(p), we conclude the provision is not applicable when an insured seeks underinsured motorist benefits.

## FACTS

In 1986, Irene Macri was involved in an automobile accident caused by another driver's negligence. The tortfeasor was insured for liability by CNA Insurance Company in the amount of $50,000. Macri's injuries exceeded that figure. Hartford Fire Insurance Company (Hartford) insured Macri with underinsured motorist coverage up to the amount of $100,000.

Macri's attorney notified Hartford in writing of his representation of Macri in any potential action against the tortfeasor. Hartford acknowledged receipt of the letter and advised Macri's counsel that the general provisions of her policy, entitled "Our Right to Recover Payment, Subsection B," stated, "If we made a payment under [the] policy and the [insured] recovers damages from another, [the insured] shall hold in trust for us the proceeds of the recovery and shall reimburse us to the extent of our payment." Hartford informed Macri that "what this means is that if we pay to you, or someone else on your behalf, medical benefits and you should recover damages from another person or their insurance carrier, then we are entitled to reimbursement."

Hartford's insurance policy contained the following exclusion: "We do not provide *Uninsured* Motorist Coverage for property damage or bodily injury sustained by any person: . . . . [¶] 2. If that person or the legal representative settles the bodily injury or property damage claim without our consent." (Italics added.) None of Hartford's correspondence, however,

either indicated that Hartford expected to be involved in settlement negotiations or advised Macri that *underinsurance* coverage was contingent on Hartford's consent to settlement.

Two years later, Macri settled with the tortfeasor's insurer for the policy limit ($50,000), and executed a "Release of all claims" against the tortfeasor. Macri did not seek Hartford's consent to the settlement. Instead, she filed a claim with Hartford for underinsured motorist benefits in the amount of $50,000—the difference between the tortfeasor's policy limits and her underinsured policy limits of $100,000. Hartford refused coverage on the ground that Macri settled her claim against the tortfeasor without Hartford's consent. Hartford then filed this declaratory relief action against Macri and was granted summary judgment on the consent issue. The trial court's order stated that the "policy language is too clear to ignore."

The Court of Appeal affirmed, with one justice dissenting. It held that the "consent" requirement under the policy applied to both uninsured motorist and underinsured motorist claims. As we explain, we reverse the Court of Appeal judgment.

## DISCUSSION

### 1. *The Insurance Policy*

Part C of the standard policy issued by Hartford is labeled "Uninsured Motorist Coverage" and is a separate endorsement that provides, "We will pay damages for which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle, we will pay only after the limits of liability under any applicable liability bonds or policies have been exhausted by payment of judgments or settlements. [¶] Any judgment for damages arising out of a suit brought without our written consent is not binding on us." Thereafter, "uninsured motor vehicle" is defined in four separate definitions. The second definition equates uninsured motor vehicle with an underinsured motor vehicle "with respect to damages for bodily injury only. An underinsured motor vehicle is one to which a liability bond or policy applies at the time of the accident but its limit for liability is less than the limit of liability for this coverage."

Exclusions appear on the next page of the policy. As noted above, that section states, in part, "A. We do not provide Uninsured Motorists Coverage for property damage or bodily injury sustained by any person: . . . [¶] 2. If that person or the legal representative settles the bodily injury or property damage claim without our consent."

The policy requires the insured to provide the insurer with copies of legal papers in the event suit is brought and also to provide the insurer with "proof that the limits of liability under any applicable liability bonds or policies have been exhausted by payment of judgments or settlements."

## 2. *Section 11580.2*

■ The above policy language is essentially identical to the statutory language in section 11580.2, which governs both uninsured and underinsured motorist coverage. Indeed, "the provisions of the statute are a part of every policy of insurance to which it is applicable." (*Traveler's Indem. Co.* v. *Kowalski* (1965) 233 Cal.App.2d 605, 609 [43 Cal.Rptr. 843].) ■ The purpose of the statute is "to protect one lawfully using the highway by assuring him of payment of a minimum amount of an award to him for bodily injury caused by the actionable fault of another driver." (*Fireman's Fund etc. Co.* v. *Ind. Acc. Com.* (1964) 226 Cal.App.2d 676, 677-678 [38 Cal.Rptr. 336].)

Section 11580.2, subdivision (b) defines an "uninsured motor vehicle" as "a motor vehicle with respect to the ownership, maintenance or use of which there is no bodily injury liability insurance or bond applicable at the time of the accident, or there is the applicable insurance or bond but the company writing the insurance or bond denies coverage thereunder or refuses to admit coverage thereunder except conditionally or with reservation, *or an 'underinsured motor vehicle'* as defined in subdivision (p). . . ." (Italics added.)

Section 11580.2(p) governs actions by insureds injured by underinsured tortfeasors—that is, tortfeasors who generally purchased the minimum amount of accident coverage that is adequate to meet legal requirements of insurance, but less than the underinsured motorist limits carried by the injured person. (§ 11580.2(p)(2); *State Farm Mut. Auto. Ins. Co.* v. *Messinger* (1991) 232 Cal.App.3d 508, 513 [283 Cal.Rptr. 493].) Section 11580.2(p) provides that "This subdivision applies only when bodily injury, as defined in subdivision (b), is caused by an underinsured motor vehicle. If the provisions of this subdivision conflict with subdivisions (a) through (o) [governing uninsured motorist coverage], the provisions of this subdivision shall prevail."

The provisions governing uninsured and underinsured motorist coverage differ substantially in the area of settlement of claims, setoff, reimbursement, and procedures before settlement. For example, in contrast to the uninsured motorist provisions, there is no right to subrogation under the underinsured motorist provisions. Thus, an insurer who pays an underinsured motorist

claim is entitled to reimbursement or credit in the amount its insured receives from either the underinsured driver or that driver's liability carrier. (§ 11580.2(p)(5).)

■ Of significance in this case is section 11580.2(c)(3), which provides that an insured who without the consent of the insurer settles or obtains a judgment against an *uninsured* motorist responsible for the insured's injuries loses the uninsured motorist coverage for the accident. (*Fireman's Fund etc. Co. v. Ind. Acc. Com., supra,* 226 Cal.App.2d at pp. 609-610.) ■ ■ Strict adherence to the rule of consent in the uninsured motorist context has been followed, and the insurer is not required to show prejudice before it may claim the benefit of the exclusion. (*Id.* at p. 610.)[1] This consent provision in part protects the insurer's right to subrogation that is found in section 11580.2, subdivision (g), which states: "The insurer paying a claim under an uninsured motorist endorsement or coverage shall be entitled to be subrogated to the rights of the insured to whom the claim was paid against any person legally liable for the injury or death to the extent that payment was made. The action may be brought within three years from the date that payment was made hereunder."

■ Macri asserts that although the consent requirement of section 11580.2(c)(3) protects the insurer's subrogation rights in the *uninsured* context, such protection is not afforded the first party insurer in the underinsured motorist provisions of the statute. In particular, Macri points to section 11580.2(p)(3), which provides that underinsured motorist coverage does not apply until the limits of bodily injury liability policies applicable to all insured motor vehicles causing the injury have been exhausted and proof of the payment is submitted to the injured party's insurer. Macri contends this provision defeats any statutory right to subrogation the insurer may assert because "if the tortfeasor's policy limits are exhausted by a settlement, the tortfeasor's insurance company will insist upon a release of its insured which would, of course, extinguish any subrogation rights."

In response, Hartford contends that because uninsured and underinsured motorist coverage is sold as a single policy, and treated as one coverage under the statute, the Legislature intended the consent provision of section 11580.2(c)(3) to apply equally to uninsured and underinsured coverage.

[1]We note that the Hartford policy arguably is less rigid than the statute because, unlike section 11580.2(c)(3), it does not require the insured to seek the insurer's consent to "prosecute to judgment any action." The fact that the policy focuses on settlement alone, however, does not affect our conclusion that section 11580.2(c)(3) is inapplicable to underinsured motorist claims. In any event, to the extent petitioner's insurance policy conflicts with section 11580.2, the statute prevails. (See e.g., *Prudential-LMI Com. Ins.* v. *Superior Court* (1990) 51 Cal.3d 674, 684 [274 Cal.Rptr. 387, 798 P.2d 1230].)

Hartford asserts that in approving the underinsured motorist provisions of the statute, the Legislature was aware that the consent requirement was essential to protecting the insurer's right to seek subrogation from the tortfeasor's personal assets of amounts it must pay to the injured insured out of the underinsurance proceeds. This subrogation right, Hartford argues, amounts to indemnification from the tortfeasor, and is independent of its right to seek "reimbursement or credit in the amount received by the insured" under section 11580.2(p)(5).[2]

In a related argument, Hartford contends that the consent to settle provision of section 11580.2(c)(3) protects its right to seek reimbursement under section 11580.2(p)(5) *before* a release is signed by the tortfeasor's insurer and further encourages potentially underinsured motorists to seek adequate coverage under their own policies.

As we explain, although the statute is not a model of clarity, we believe that Macri states the better interpretation of section 11580.2. We begin by discussing the underlying legislative intent in drafting the underinsurance coverage provisions of that section.

### 3. *Legislative Intent*

In ascertaining the Legislature's intent in drafting the underinsured motorist provisions of section 11580.2, we must first turn to the words of the statute itself. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) Where the statute is clear, courts will not "interpret away clear language in favor of an ambiguity that does not exist." (*Campbell* v. *State Farm Mut. Auto. Ins. Co.* (1989) 209 Cal.App.3d 871, 875 [257 Cal.Rptr. 542].) "It is fundamental that legislation should be construed so as to harmonize its various elements without doing violence to its language or spirit. Wherever possible, potentially conflicting provisions should be reconciled in order to carry out the overriding legislative purpose as gleaned from a reading of the entire act. [Citation.] A construction which makes sense of an apparent inconsistency is to be preferred to one which renders statutory language useless or meaningless." (*Wells* v. *Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217]; see also *Knass* v. *Blue Cross of California* (1991) 228 Cal.App.3d 390, 395 [279 Cal.Rptr. 124] [statutory provisions must be harmonized].) Our review of legislative history reveals the

---

[2]Section 11580.2(p)(5) states that the "insurer paying a claim under this subdivision shall, to the extent of the payment, be entitled to reimbursement or credit in the amount received by the insured from the owner or operator of the underinsured motor vehicle or the insurer of the owner or operator."

Legislature intended section 11580.2(c)(3) to apply only to uninsured motorist coverage.

Underinsured motorist coverage was introduced in 1984 as Assembly Bill No. 3984 (AB 3984) to "expand the definition of uninsured motor vehicle to include underinsured motor vehicles. . . ." (Leg. Counsel's Dig., Assem. Bill No. 3984, 4 Stats. 1984 (Reg. Sess.) Summary Dig., p. 539.) As originally submitted, AB 3984 amended the definition of uninsured motorist to include underinsured motorist coverage, but it provided for separate procedures for administering underinsured motorist claims. The Legislative Counsel's Digest also stated that "the procedures for administering the underinsured motorist coverage and claims thereunder will track with existing uninsured motorist statutes, except where inapplicable." (Dig. of Sen. Republican Caucus (Aug. 29, 1984) regarding AB 3984.) Thereafter, the Legislature identified those areas where uninsured motorist provisions might not apply to underinsured motorist coverage. These include: "1. Coordination v. stacking of other available insurances. [¶] 2. Procedures utilized in claims out of multi-vehicle accidents. [¶] 3. Tracking of underinsured and third party actions. [¶] 4. *Matter[s]* of setoffs and credits." (*Ibid.*, italics added.)

Prior to becoming law, AB 3984 was amended to address the above four concerns with the addition of section 11580.2(p)(3) (coordination of available insurance), (p)(4) (procedures to be followed in multi-vehicle accidents, (p)(6) (tracking of underinsured and third party actions), and *(p)(5) (setoffs and credits)*. Thereafter, AB 3984 was enacted as an amendment to section 11580.2.

As noted above, section 11580.2(p)(3) provides that underinsured coverage does not apply until the limits of bodily injury have been exhausted and proof of payment is submitted to the insurer providing the underinsured motorist coverage. The effect of section 11580.2(p)(3) is to require (and therefore by implication to authorize) the insured to prosecute actions against the underinsured, to obtain a settlement and/or judgment and to submit proof of payment to the insurer. If the insured fails to follow the mandate of section 11580.2(p)(3), there is no underinsured motorist coverage available. Thus, if the consent requirement is deemed to apply to underinsured coverage, the insurer is given complete control over a prerequisite to that coverage—the prosecution and settlement of the action against the underinsured motorist. Allowing the insurer a power to thwart coverage at a threshold level by preventing fulfillment of a policy requirement would defeat the manifest intent of the statute to provide mandatory coverage where an insured suffers bodily injuries from an underinsured motorist.

In contrast, in the uninsured motorist context, the insured is not required to pursue any legal action to secure coverage; indeed, the insured must obtain consent to settle or even to prosecute to judgment any such action. Thus, although the consent requirement of section 11580.2(c)(3) creates a logical progression of events in the uninsured motorist context, it would frustrate the statutory scheme if required in the underinsured context.

Moreover, under section 11580.2(p)(5), the insurer is entitled to reimbursement or credit in the amount received by the insured from the underinsured tortfeasor or his or her insurer. This right of reimbursement, which is automatically protected without application of section 11580.2(c)(3), is specifically limited to the underinsured tortfeasor's *policy limits* and precludes the insurer from asserting additional subrogation rights. Nonetheless, the right to reimbursement under section 11580.2(p)(5) does not mature until *after* the insured has received policy limits from the underinsured's carrier by "judgments or settlements, and proof of the payment is submitted to the insurer providing the underinsured motorist coverage." (§ 11580.2(p)(3).)

This reimbursement between insured and insurer is the foundation of section 11580.2(p). ■ "[U]nderinsured motorist coverage is not the equivalent of full excess coverage. As the statutory scheme is designed, the underinsured motorist carrier gets a dollar-for-dollar credit for all payments by third party tortfeasors to the insureds, whether the insureds are made whole or not. In other words, a carrier providing underinsured motorist benefits *never* pays the full amount, only the difference between the policy limits and all contributions by all tortfeasors to all insureds." (*Malone* v. *Nationwide Mutual Ins. Co.* (1989) 215 Cal.App.3d 275, 277 [263 Cal.Rptr. 499], italics in original.)

Thus, the "California underinsurance scheme focuses on the *amount* of the tortfeasor's automobile liability policy. Conversely, [other states'] statutes concentrate on the amount of the injured driver's damages. [California's] focus on the tortfeasor's liability restricts the availability of underinsurance coverage even where the injured driver suffers uncompensated damages. Unless the tortfeasor's liability policy is in an amount less than the underinsured motorist policy of the injured driver, underinsurance is not available." (Schmidt, *Interpreting the Recently Enacted California Underinsurance Provisions of the Uninsured Motorist Statute* (1987) 14 Pepperdine L.Rev. 691, 694-695, fns. omitted, italics added; *Fagundes* v. *American Internat. Adjustment Co.* (1992) 2 Cal.App.4th 1310, 1315 [3 Cal.Rptr.2d 763].)

Therefore, because the insured cannot receive more than the policy limits from the insurer providing underinsurance motorist coverage, there is no

requirement under the statutory scheme that such insurer be subrogated to the insured's statutory right to recover from the underinsured tortfeasor or its insurer.

■ Accordingly, although the Legislature generally intended section 11580.2 to regulate both uninsured and underinsured motorist coverages as a single coverage (see § 11580.2, subd. (n)), in doing so it created *separate* settlement requirements for the different types of coverages in order to accommodate both the needs of the insureds and the requirements of the insurer. By specifically adding section 11580.2(p)(3) and section 11580.2(p)(5), and by specifying separate substantive and procedural requirements and limitations applicable in the underinsurance context only, it appears the Legislature intended to exclude the consent requirement of section 11580.2(c)(3) from the underinsured motorist provisions.

### 4. *Subrogation*

■ Contrary to Hartford's assertion, we find that the right to subrogation in the underinsured motorist context is not consistent with the plain meaning of the statute and, if allowed, would lead to anomalous results.

Clearly, when faced with an uninsured claim, the insurer must be made aware of any potential judgment or settlement in order to protect its subrogation rights and to prevent double recovery. (*Mills* v. *Farmers Ins. Exchange* (1964) 231 Cal.App.2d 124 [41 Cal.Rptr. 650].) There is no need, however, for such protection in the underinsured motorist context. This is so because the underinsured carrier is not required to indemnify its insured until the insured has exhausted the limits of the tortfeasor's liability policies by either settling the claim or obtaining a judgment against the tortfeasor and submits proof of payment to the insurer. (§ 11580.2(p)(3).) Under these circumstances, there is no danger of double recovery.

Courts have recognized that in an uninsured motorist claim, in which there is far less chance of securing any other recovery, the insurer's right of subrogation under section 11580.2, subdivision (g) must be protected. (See *Mills, supra,* 231 Cal.App.3d 124.) By contrast, the underinsured motorist insurer has specifically enumerated reimbursement rights, exclusive of subrogation, that govern the underinsured carrier's actions up to the point that the limits of the insured tortfeasor's policy are paid. Thus, before underinsured motorist coverage applies, the insured must either settle or reach a judgment in the amount of the limits of the tortfeasor's policy. (§ 11580.2(p)(3).) Accordingly, the purpose of underinsured motorist coverage is to maintain the status quo of coverage—the insured is compensated for the difference between the tortfeasor's policy limits and the limits of the insured's underinsured motorist coverage.

One commentator's observation further illustrates this point. Paul Eisler notes that "[a] close reading of the statute forces the conclusion that *before* underinsurance coverage applies there either must exist a *settlement* or *judgment* in the amount of the limits of the insured tortfeasor's policy. . . . [¶] In all fairness though we must take into consideration . . . Section 11580.2(p) which provides that in the event 'underinsurance' coverage conflicts with . . . [subdivisions] [*(a) through (o)*], the provisions of the 'underinsurance' shall prevail. Therefore since there is an obvious conflict between . . . *Section 11580.2(p)(3)* and . . . *Section 11580.2(c)(3)* the insured must be able to obtain a judgment or settlement without voiding the application of his policy." (1 Eisler, Uninsured Motorist Law (1986) § 15.50, at p. 12-8, italics in original.)

Another commentator has observed that "The fundamental characteristic of the underinsured motorist insurance is that it is only relevant when the tortfeasor's insurance is not adequate to provide indemnification. . . . It is patently inappropriate to consider that the underinsured motorist insurer would be entitled to reimbursement from these funds. In this context, allowing an insurer to be subrogated to amounts which may be recovered from the tortfeasor, from joint tortfeasors, or collateral sources (such as workers' compensation) serves to reduce the underinsured motorist insurance. Thus, when the possible sources of indemnification against which a subrogation right might be exercised are considered, it seems evident that a persuasive case can be made for precluding an insurer from seeking reimbursement unless the insured has been fully indemnified. Furthermore, it seems probable that courts in those states which hold that setoffs or reductions of liability are unenforceable, will also restrict insurers to a limited right of subrogation (that only applies when an insured has been fully indemnified.)" (3 Widiss, Uninsured and Underinsured Motorists Insurance (2d ed. 1990) § 41.1-44.4, at pp. 129-130, fns. omitted; see also Eisler, Uninsured Motorist Law, *supra*, § 15.50, at p. 12-4.)

In addition, the facts in this case illustrate that the potential for double recovery on the part of the insured does not exist in the underinsurance context. As discussed above, Macri's counsel notified Hartford of the pending claim against the tortfeasor soon after the accident pursuant to section 11580.2(p)(6). Hartford acknowledged counsel's letter and informed counsel it would seek recovery for medical expenses should its insured "recover damages from another." Hartford sent a more detailed letter to Macri, in which it identified the tortfeasor's name, requested the medical report from Macri, and added, "This will also advise you that under the General Provisions of your policy, 'Our Right to Recover Payment,' Subsection B states: 'If we made a payment under this policy and the person to or from whom the

payment is made recovers damages from another, that person shall hold in trust for us the proceeds of the recovery and shall reimburse us to the extent of our payment.' What this means is that if we pay to you, or someone else on your behalf, medical benefits and you should recover damages from another person or their insurance carrier, that we are entitled to reimbursement.' " At no time did Hartford advise Macri that it would enforce the "consent to settle" provision found in the statute or the policy.

Soon thereafter, Macri notified Hartford that she had settled her claim with the underinsured tortfeasor for the tortfeasor's insurance policy limits and submitted proof of the settlement payment to Hartford pursuant to section 11580.2(p)(3). At no point in the communications between insured and insurer was Hartford's right to reimbursement or credit "to the extent of the payment" ever compromised or denied by Macri's actions. Indeed, by following the plain language of the statute, Macri preserved Hartford's ability to seek reimbursement under the statute.

Hartford relies on *Rudd* v. *California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 953 [268 Cal.Rptr. 624], to support its contention that section 11580.2(c)(3) applies in the underinsured context. We find the case inapposite.

In *Rudd*, the court held that an insurer is entitled to reduce the amount it owed under the underinsured policy provision by the amount of workers' compensation benefits received by the insured. In so holding, the court rejected the insured's argument that the omission of any mention of a workers' compensation setoff in section 11580.2(p), that is allowed in the uninsured motorist context under section 11580.2, subdivision (h), indicated a legislative intent to exclude any such setoff in underinsured cases. (*Rudd* v. *California Casualty Gen. Ins. Co., supra,* 219 Cal.App.3d 948.)

In accepting the insurer's argument that the setoff provision in section 11580.2, subdivision (h) applies to both uninsured and underinsured motorist coverage, and that section 11580.2(p) merely identifies additional and cumulative setoffs to be applied when the tortfeasor is underinsured, the *Rudd* court stated: "We note that section 11580.2 regulates both uninsured and underinsured motorist coverages. . . . For many purposes section 11580.2 treats uninsured and underinsured motor vehicles as synonymous . . . . [¶] The mere fact that subdivision (p) does not *specifically* incorporate or refer to other provisions of section 11580.2 does not mean those other provisions conflict with subdivision (p), rendering them inapplicable to underinsured cases. . . . [¶] We therefore agree with Insurer that the specific setoff provided in subdivision (p) is cumulative to, rather than exclusive of, the

other setoff provisions of section 11580.2." (*Rudd* v. *California Casualty Gen. Ins. Co.*, *supra*, 219 Cal.App.3d at pp. 953-954; see also *Chrisman* v. *Superior Court* (1987) 191 Cal.App.3d 1465, 1468-1469 [236 Cal.Rptr. 703] [binding arbitration provisions of § 11580.2, subd. (f) applicable to dispute involving payment of underinsured motorist benefits].)

Thus, in contrast to the present case, the *Rudd* court found no conflict between the worker's compensation provision of section 11580.2, subdivision (h) and section 11580.2, subdivision (p). We conclude there is a conflict between section 11580.2(c)(3) and section 11580.2(p)(3). Accordingly, we are unpersuaded by the reasoning of the *Rudd* court under these facts.

Finally, Hartford asserts that if we conclude section 11580.2(c)(3) is not applicable to underinsured motorist coverage, we will be encouraging motorists to buy only the bare minimum policy required under the statute, creating a tremendous burden on the automobile insurance system and potentially requiring insurers to raise policy premiums to cover the amount paid by the insurer after the underinsured's policy limits are exhausted. We doubt this scenario would occur and believe that the Legislature is in the best position to determine whether the statutory scheme it created leads to intentional undercoverage.

CONCLUSION

Based on the foregoing, we conclude that because an insurer is not obligated under section 11580.2(p) to make any payment to its insured until after the insured has settled with the underinsured motorist, the "consent to settle" clause that is applicable in claims involving uninsured motorists does not apply to underinsured motorist claims. Accordingly, we reverse the Court of Appeal judgment and remand the case for proceedings consistent with the views expressed herein.

Mosk, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**PANELLI, J.**—I reluctantly concur with the majority's opinion. The language of Insurance Code, section 11580.2, subdivision (c)(3), relating to the "consent to settle" provision, is intended to protect the insurer's right of subrogation against the uninsured tortfeasor. (See maj. opn., *ante*, at p. 325.) In my view, then, the issue becomes whether the underinsured motorist carrier has a right to subrogation.

Unfortunately, as noted in the majority opinion, the language of section 11580.2 of the Insurance Code[1] cannot be interpreted to provide underinsured motorist carriers with a right to subrogation. The Legislature explicitly provided uninsured motorist carriers with the right to subrogation. (§ 11580.2, subd. (g).) The Legislature did not, however, expressly provide underinsured motorist carriers with the same right to subrogation. Instead, underinsured motorist carriers have an explicit right to seek reimbursement or credit from their insureds. (§ 11580.2, subd. (p)(5).) Because we are limited by the language providing that provisions of subdivision (p) shall prevail in the event there is a conflict with subdivisions (a) through (o) (§ 11580.2, subd. (p)), and because the provisions of subdivisions (p)(3) and (p)(5) may be interpreted to conflict with a right to subrogation (maj. opn., *ante*, at pp. 324, 328), we have limited underinsured motorist carriers to the right to seek reimbursement or credit from their insureds. (§ 11580.2, subd. (p)(5).)

However, as noted during oral argument, this result leads to an inequity demonstrated by the following hypothetical. Assume two tortfeasors each have $300,000 in assets subject to execution. One tortfeasor does not buy automobile insurance. The other purchases the minimum policy limit required by law. Each tortfeasor is involved in an automobile accident. Under the current provisions, the uninsured motorist is potentially liable to the uninsured motorist carrier of the victim while the underinsured motorist's assets cannot be reached by the underinsured motorist carrier of the victim. Thus, an uninsured motorist carrier may always have the opportunity to recover its costs directly from the tortfeasor, while the underinsured motorist carrier is forced to depend on its insured to seek the tortfeasor's assets. The distinction in subrogation rights between the two insurers in this situation makes little sense and in effect makes the underinsured motorist carrier an excess policy carrier to the tortfeasor.

The current legislative scheme is also unfair because it may in certain cases, promote an incentive to underinsure. In such cases, the motoring public will be forced to pay for the impending increase in underwriting costs in the form of increased premiums. The Legislature has shown its intent to shift the costs of motor vehicle accidents from the motoring public to those more suited to bear this cost. (*Rangel* v. *Interinsurance Exchange, ante,* at p. 1 [14 Cal.Rptr.2d 783, 842 P.2d 82], citing *California State Auto. Assn. Inter-Ins. Bureau* v. *Jackson* (1973) 9 Cal.3d 859, 869 [109 Cal.Rptr. 297, 512 P.2d 1201] [In enacting the arbitration provisions of section 11580.2, subdivision (f), the Legislature intended to shift the costs of industrial injuries from the motoring public to the employer or workers' compensation carrier.].) Although we are constrained by the language which solves con-

---

[1]All further statutory references are to the Insurance Code unless otherwise indicated.

flicts between subdivision (p) and other subdivisions in favor of the provisions of subdivision (p) (§ 11580.2, subd. (p)), the Legislature could not have intended the motoring public to subsidize the motor insurance of those who have underinsured their assets. In sum, I urge the Legislature to study and consider the consequences of denying subrogation to the underinsured motorist carriers and to enact a suitable amendment to section 11580.2.